485 F.2d 1
 5 ERC 1694, 3 Envtl. L. Rep. 20,752
 FRIENDS OF THE EARTH et al., plaintiffs-Appellees,
v.
Ellis L. ARMSTRONG, Commissioner, Bureau of Reclamation, and
Rogers D. B. Morton, Secretary of the Interior,
Defendants-Appellants. State of colorado
et al.,
Defendants-
Intervenors-
Appellants.
 Nos. 73-1223 and 73-1278 to 73-1283.
 United States Court of appeals,
Tenth Circuit.
 Aug. 2, 1973.
Certiorari Denied Jan. 21, 1974.
See 94 S.Ct. 933.
 
 Raymond N. Zagone, Atty., Dept. of Justice (Wallace H. Johnson, Asst. Atty. Gen., C. Nelson Day, U. S. Atty., Thomas L. McKevitt and Robert L. Klarquist, Attys., Dept. of Justice, with him on the brief), for defendants-appellants.
 James B. Lee and Owen Olpin, Salt Lake City, Utah (Constance K. Lundberg and Chris Wangsgard, Salt Lake City, Utah, with them on the brief), for plaintiffs-appellees.
 Kenneth Balcomb, Glenwood Springs, Colo. (Frank E. Maynes, Durango, Colo., with him on the brief), for intervenorsdefendants.
 Edward W. Clyde, Salt Lake City, Utah (Raphael J. Moses, Boulder, Colo., and Clyde O. Martz, Denver, Colo., with him on the brief), for intervenors-defendants, on rebuttal.
 Before LEWIS, Chief Judge, and HILL, SETH, HOLLOWAY, McWILLIAMS, BARRETT and DOYLE, Circuit Judges, sitting en banc.
 SETH, Circuit Judge.
 
 
 1
 These suits were commenced in the United States District Court for the District of Columbia, and transferred to the District of Utah. They are in the nature of mandamus, and seek also injunctive and declaratory relief. The initial defendants were the Secretary of the Interior and the Commissioner of the Bureau of Reclamation. The plaintiffs seek to have these officials take such action as may be necessary to prevent the water being impounded in Lake Powell from spreading into any part of Rainbow Bridge National Monument.
 
 
 2
 The plaintiffs are Friends of the Earth, a nonprofit membership corporation organized under the laws of New York. The purposes of this corporation include the "preservation," "restoration," and "rational use" of the environment in the United States and throughout the world. The plaintiff, Wasatch Mountain Club, Inc., is a nonprofit membership corporation organized under the laws of Utah with purposes similar to those of Friends of the Earth. The individual plaintiff is Kenneth G. Sleight of Utah who is head of a corporation which conducts for profit river tours and other tours including those to Rainbow Bridge. We hold the plaintiffs have standing to bring this action.
 
 
 3
 The intervenors-defendants-appellants include the States of Utah and Colorado, also several water conservation districts, and electrical power associations.
 
 
 4
 The plaintiffs, defendants, and intervenors all moved for summary judgment. Numerous affidavits were filed with attached tables, reports, maps, photographs, and other material; there was also filed a stipulation of facts. One witness testified as to the unsightly appearance which would result if water from the reservoirs entered the Monument.
 
 
 5
 The trial court, D.C., 360 F.Supp. 165 entered a judgment and decree granting plaintiffs' motion for summary judgment. This decree ordered the defendant officials to take action to have the waters from Lake Powell withdrawn from within the boundaries of Rainbow Bridge National Monument, and to prevent in the future such encroachment.
 
 
 6
 The defendants and intervening defendants have taken this appeal. The decree of the District Court was stayed pending an expedited hearing of this court sitting en banc on the appeal of the case on its merits.
 
 
 7
 This case reaches us on the issue of whether or not the trial court was correct in holding that certain provisions of the Colorado River Storage Project Act of 1956 (43 U.S.C. Sec. 620), and especially sections 1 and 3 thereof prohibit any water from Lake Powell entering any part of the Rainbow Bridge National Monument.
 
 
 8
 The record shows that the water enters the Monument when the water level in Lake Powell reaches 3,606 feet above mean sea level. The plaintiffs did not assert a claim based upon the possibility of physical damage to the Rainbow Bridge itself, but relied upon the statutory provisions in the Colorado River Storage Project Act.
 
 
 9
 We must conclude that the trial court was in error, and the case must be reversed.
 
 
 10
 Rainbow Bridge National Monument;
 
 
 11
 This Monument was created by Presidential Proclamation in 1910, and is a square tract of 160 acres in the southernmost portion of Utah between the Colorado River Canyon and the Arizona state line. The Monument has been visited by few people in past years because of its isolated location. It is a very important Monument and contains a unique work of nature. Rainbow Bridge itself is an impressive natural sandstone arch of great size extending across the inner gorge or cut of Bridge Creek within a larger canyon. Within and under the span, the inner gorge of Bridge Creek is seventy to seventy-five feet deep and extends below the lower base or abutment of the arch. It has steep, rocky, shelving, sandstone sides. Bridge Creek is an intermittent stream which flows into Lake Powell, the reservoir created by Glen Canyon Dam. This reservoir is still in the process of filling, and thus the maximum water level has not been reached. The annual high water mark has varied from year to year depending on the runoff in the Colorado River Basin. The level also varies month by month, and will continue to do so, by reason of release of water from the reservoir for a variety of purposes.
 
 
 12
 As the level of Lake Powell rises, the water, of course, backs up the side canyons including that of Bridge Creek. When the water level in the Lake reaches 3,606 feet above mean sea level, the reservoir water has moved up the bed of Bridge Creek to a point at the outer boundary of the 160-acre tract of land comprising Rainbow Bridge National Monument. At any higher level the water enters the Monument within the creek bed at the bottom of the deep Bridge Canyon. When the water level of Lake Powell reaches the level of 3,700 feet above sea level, which is the maximum design capacity for Glen Canyon Dam, the reservoir water will be standing in the inner gorge of the creek under the Rainbow Bridge Arch. At this level the water will there have a depth of about forty-eight feet, but will not rise enough to get out of the gorge or to reach the base of the Rainbow Bridge Arch since this point is some twenty-five feet above that level. The water, however, would then be well within the boundaries of the Monument although confined in the inner gorge of the creek.
 
 
 13
 As indicated, the water level is subject to frequent and wide variations. This results in an unsightly deposition of sediments and debris, as well as a conspicuous staining of the rocks at the various water levels all through the reservoir area.
 
 
 14
 The waters from Lake Powell first entered the outer boundaries of the Monument in May 1971, and withdrew as the Lake level dropped but again entered one or more times.
 
 Glen Canyon Dam:
 
 15
 This Dam is on the Colorado River near the Arizona-Utah boundary and was built in the period 1957 to 1964. The Dam has a maximum design capacity at 3,700 feet above sea level. There are two large spillways, each with gates, and designed to handle a flow of 276,000 cubic feet per second. Water may be also discharged from the Lake into the power generating plants at a rate of 25,000 cubic feet per second when there is a full demand for power. The centers of the intakes to the power plant are at 3,470 feet above sea level. There are additional outlet works or bypasses whereby water may be released through the Dam at 3,374 feet elevation at a maximum rate of 15,000 cubic feet per second. The maximum capacity of the outlet works below the level of the spillways is thus 40,000 cubic feet per second. This is a factor which is significant, and will be referred to later herein.
 
 
 16
 With a water level of 3,700 feet, the total storage capacity of the Lake is estimated at 27,000,000 acre feet. At the level of 3,606 feet as ordered by the trial court, the total storage capacity is about 12,751,000 acre feet.
 
 
 17
 The power facilities at the Dam are designed to generate a large amount of electricity to provide additional power to the Southwest, and to the Pacific Coast. This power generation was considered by Congress at length in the hearings conducted on the proposed construction of the Dam, both as to the availability of the additional power, and the revenue to be derived from its sale. The planned quantity of electricity which was to be generated and the revenues therefrom were predicated upon the Dam being utilized to its maximum design capacity, and this would also provide a firm source on an annual basis.
 
 Colorado River Waters:
 
 18
 The division or allocation of the waters of the Colorado River was commenced by the Colorado River Compact signed in 1922 by representatives of Arizona, California, Colorado, Nevada, New Mexico, Utah, and Wyoming, subject to approval by the various state legislatures and by Congress. This Compact, which has the status of a treaty, is described in Arizona v. California, 373 U. S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542, and is set out at 70 Cong.Record 324 (1928). This agreement divided the entire river basin in two parts, the Lower Basin and the Upper Basin, with the dividing point at Lees Ferry, Arizona, which is a short distance below Glen Canyon Dam. The water was apportioned 7,500,000 acre feet per annum to each Basin, with recognition given to a portion to be released to Mexico. The Compact further provided that the Upper Basin states will not cause the flow of the river at Lees Ferry to be depleted below an aggregate of 75,000,000 acre feet for any ten year period. As is indicated, the division of the water was made on the assumption that there would be available annually a total of 15,000,000 acre feet, and the Upper Basin obligation to deliver at Lees Ferry was so undertaken. Stream flow since the date the Compact was negotiated has been considerably less than the assumed amount.
 
 
 19
 In 1948 the Upper Basin states entered into another compact, this time to divide the Upper Basin water, again subject to approval by the legislatures and by Congress. This division was accomplished by allocating a percentage of available water to each state with one exception.
 
 The Statutes:
 
 20
 With the basic division of the Colorado River water agreed upon, the planned development of the Colorado River Basin proceeded. In 1956 Congress passed the comprehensive Colorado River Storage Act (43 U.S.C. Sec. 620 et seq.; Public Law 485, 84th Cong.2d Sess.). This Act recited that it was to accomplish a comprehensive development of the Colorado River, regulating its flow and storing water, making it possible for the states of the Upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact. The Act authorized the Secretary of the Interior to construct and operate the initial units of the storage project consisting of Curecanti, Flaming Gorge, Navajo Dam, and Glen Canyon.
 
 
 21
 The Storage Act also authorized the creation of the Upper Colorado River Basin Fund. This directs that proceeds from sale of power and other revenues from Upper Basin facilities be available for the Upper Basin Fund. This Fund is to meet maintainance, operating, and replacement costs of the Colorado River Storage Project and of many participating projects. The Fund is also to be used to repay power and municipal costs incurred by the Government including interest. If there is a surplus the money goes to the Upper Basin states for repayment of project costs.
 
 
 22
 As part of the Storage Act, Congress included the two following provisions which are in issue here. The record shows this was done in response to the objections made by some conservation groups. Thus Congress in the Storage Act (43 U.S.C. Sec. 620) included a proviso in section 1:
 
 
 23
 "That as part of the Glen Canyon Unit the Secretary of the Interior shall take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument."
 
 
 24
 There was also included in section 3 the following:
 
 
 25
 "It is the intention of Congress that no dam or reservoir constructed under the authorization of this Act shall be within any national park or monument."
 
 
 26
 During the course of construction of Glen Canyon Dam, other dams or projects were authorized under the Storage Act. These include the Navajo Project, P.L. 87-483, in June 1962; the Frying-pan-Arkansas Project, P.L. 87-590, in August 1962; Savery-PotHook, Bostwick Park, Fruitland Mesa Projects, P.L. 88-568, in September 1964. As construction of Glen Canyon Project proceeded, Congress passed annually the appropriation acts for construction of Glen Canyon Dam itself. These will be hereinafter considered, and are of great significance to the issues raised.
 
 
 27
 In 1968 Congress passed the Colorado River Basin Project Act (43 U.S.C. Sec. 1501 et seq.). This was to further carry out the Colorado River water development. This Act is significant here because it was considered after Glen Canyon Dam was completed. In the Colorado River Basin Project Act at 43 U.S.C. Sec. 1521(a), provision having been made for construction of the Central Arizona Project in the Lower Basin, it was provided that the full capacity of the aqueduct supplying water to this project could not be used unless Lake Powell was full or releases are made from Lake Powell to prevent the reservoir from exceeding the elevation of 3,700 feet or when water is released pursuant to other provisions of the Act. The Act elsewhere directs that the projects be operated to maintain as nearly as practicable active storage in Lake Mead equal to active storage in Lake Powell. This attempted equality, and the limitation on capacity of the aqueduct, is again based on the operation of Lake Powell to maximum capacity. The Act also authorized the Animas-La Plata, Dolores, Dallas Creek, and San Miguel Projects in the Upper Basin at the same time.
 
 
 28
 The provisions of the Project Act of 1968 (43 U.S.C. Sec. 1501 et seq.) are important in that they directed the Secretary of the Interior to adopt a specific plan for the operation of the reservoirs built pursuant to the 1956 Storage Act. These operating criteria were to insure that the provisions of both the Colorado River Compact and the Upper Basin Compact were carried out; and further, that the treaty deliveries to Mexico were given the proper priority. These criteria were adopted and reported to Congress.
 
 
 29
 The method of operation of the reservoirs was of great importance to the Upper Basin states to permit them to use the river regulating reservoirs to store water at the proper time and place to enable them to meet their obligation to the Lower Basin states. This storage, if sufficient, would then permit the Upper Basin states to utilize the water allocated under their Compacts, and to use the revenues to develop participating projects for irrigation. These river regulating reservoirs include Curecanti, Flaming Gorge, Navajo, and Glen Canyon. Of these, Lake Powell has some 25,000,000 acre feet of active storage if operated to capacity, while the others combined have a total of about 6,400,000 acre feet.
 
 
 30
 From the above description of the legislation, it is apparent that Lake Powell is an important element or link in the Colorado River water and power development. It cannot be considered alone as all the existing projects in the Upper Basin, and the planned ones, are interrelated and interdependent. The projects have different purposes and functions, but are dependent on Lake Powell to provide basic storage necessary to fulfill the delivery requirements to the downstream states and Mexico, especially in dry years. If these requirements can be so met by use of this storage, the upper states can develop the water allocated to them for irrigation and other projects. If this storage is reduced by a limitation on the level of Lake Powell, some projects built, and some authorized, are at least impaired. This interrelation created by the comprehensive plan for development is rather delicate and can be disturbed if the capacity of by far the largest storage or regulating unit is reduced significantly. The total development plan was given extensive consideration by water experts and by Congress. See 84 Cong. 1st Sess. (1955), S.Report 128, and 84th Cong. 2d Sess. (1956), House Report 1087. The repayment schedules and power revenues were also fully integrated into the plan. See 2 U.S.Code Cong. & Admin.News, 84th Cong. 2d Sess. (1956) 2352-59. This in turn all relates to the above two quoted sections inserted in the Storage Act and about which the issues revolve.
 
 
 31
 Action by Congress Following The Storage Act:
 
 
 32
 The provisions contained in the Colorado River Storage Act (43 U.S.C. Sec. 620 et seq.) quoted above which direct the Secretary to take protective measures as to Rainbow Bridge National Monument could not be a more specific reference. It is clearly and solely directed to the extension of Lake Powell water into the Monument. This had been considered at great length during extensive hearings, and was an issue to which the several conservation groups had directed the attention of the members of Congress by a long and vigorous campaign. See House Report No. 1087, 84th Cong. 2d Sess. (1956). There were at the time of enactment of the Storage Act no specific plans or cost estimates as to these protective works or measures referred to in section 1. With the inclusion of this provision, with additions to section 3, and with the elimination of the Echo Park Project, the conservation groups, or some of them, apparently withdrew their objections to the Act.
 
 
 33
 As quoted above, Congress inserted in the Storage Act, in section 3 thereof, the language upon which the plaintiffs place great reliance. It reads:
 
 
 34
 "It is the intention of Congress that no dam or reservoir constructed under the authorization of this Act shall be within any national park or monument."
 
 
 35
 This reference is general and all-inclusive as contrasted to the section 1 reference to Rainbow Bridge National Monument. This is a clear and direct expression of the intent of Congress, but is made in the absence of any direct prohibition or affirmative directive. This is again in contrast with section 1; however, we do not consider this factor to be of particular significance, and will assume the section 3 language to be a direct prohibition directed to the appropriate officials.
 
 
 36
 These two provisions were inserted in the context of plans for the Glen Canyon Dam which included a designed maximum water level of 3,700 feet above sea level. This is apparently the reason for the specific directive in section 1 to the Secretary to take protective measures as to Rainbow Bridge National Monument. It was apparent, and it was discussed, that water would be in the Monument at the designed level. Thus it was obvious from the start that water would be backed up into the Monument if nothing further were done. Of course, the record shows that nothing further was done, and the water has so entered the outer boundaries of the Monument.
 
 
 37
 As indicated above, there were no firm plans or cost estimates for protective works as there were for all the other aspects of the Glen Canyon Project, when Congress enacted the Storage Act in 1956. Construction began soon after and continued into 1964.
 
 
 38
 The action taken by Congress after passage of the Storage Act demonstrates a repeal of sections 1 and 3 thereof. The record shows that in 1960, in reference to the 1961 Public Works Appropriation Bill, House Report No. 1634 (86th Cong. 2d Sess.), the budget estimate for Glen Canyon Unit was reduced by $3,500,000. The House Committee Report stated in part:
 
 
 39
 "Glen Canyon Unit-An appropriation of $23,535,000 is recommended, a reduction of $3,500,000 in the budget estimate of $27,035,000. This action deletes the funds programmed for protection of the Rainbow Bridge National Monument. It has been estimated that the total cost of protecting this Bridge would be in a vicinity of $20,000,000. Access to this national monument will not be affected by the construction of Glen Canyon dam and reservoir, in fact it will be improved to some extent. The geological examination report on the problem indicates clearly that there will be no structural damage to Rainbow Bridge by the reservoir waters beneath it. The Committee sees no purpose in undertaking an additional expenditure in the vicinity of $20,000,000, in order to build the complicated structures necessary to provide the protection contemplated." (Emphasis added).
 
 
 40
 The $3,500,000 was the request by the Commissioner to begin the protective works for the Monument.
 
 
 41
 The Senate Committee, on the same Appropriation Act, reached the same conclusion (S.Report No. 1763, 86th Cong. 2d Sess.), and reported in part:
 
 
 42
 "The recommendation of the committee is in accord with the House action of disallowing all funds requested for the initiation of construction of facilities to protect the Rainbow Bridge National Monument."
 
 And added:
 
 43
 "In taking this action the committee has considered the findings of the Geological Survey that the impoundment of water in Glen Canyon Reservoir [Lake Powell] will not result in any structural damage to the Rainbow Bridge."
 
 
 44
 The deletion of funds by Congress for protective works was fully considered at committee hearings on the 1961 Appropriation Act. It may be noted that Glen Canyon Dam was then several years from completion.
 
 
 45
 The matter was again considered during the hearings and in the reports for the 1962 Public Works Appropriation Act (see 87th Cong. 1st Sess., House Report No. 1125, and Senate Report No. 1097). Requested funds for protective works were again disallowed. The Senate Report No. 1097 explained why- that no damage would result and the costs were too great.
 
 
 46
 In the 1962 Appropriation Act, this proviso was inserted:
 
 
 47
 "Provided, That no part of the funds herein appropriated shall be available for construction or operation of facilities to prevent waters of Lake Powell from entering any National Monument."
 
 
 48
 Thus the funds specifically requested for protective works by the Commissioner were again disallowed, and of greater significance, the express prohibition as to use of funds was thus added. At hearings again the matter was fully considered.
 
 
 49
 In 1963 the Secretary of the Interior raised the issue of protective works for Rainbow Bridge before Congress although no formal budget request had been made for them. References in the hearings were made as to the changes in the law, and the Secretary was advised that protective works would not be considered. See 87th Cong. 2d Sess. House Subcommittee Hearings on Appropriations, Public Works Appropriations, 1963, Part 3. Also see the Senate Hearings on Public Works Appropriations for 1963.
 
 
 50
 In the years after 1963 the Secretary did not make further formal requests for funds for protective works. However, all subsequent Appropriation Acts for public works to 1973 carry the same prohibition quoted above. Thus the proviso appeared in some twelve separate Acts, and was considered and enacted during virtually all stages of construction of Glen Canyon Dam and thereafter.
 
 
 51
 The Appropriation Act for 1972, referred to above, for the Upper Colorado River Storage Project (P.L. 92-134), was considered during the latter part of 1971 and in 1972. This Act contained the same proviso that funds be not used for protective works, and it is of interest that water from Lake Powell was within the boundaries of Rainbow Bridge National Monument continuously from May 15, 1971, to September 15, 1972, and from October 20, 1972, to January 1, 1973.
 
 
 52
 The record thus demonstrates affirmatively that Congress evaluated the consequences of water encroachment into Rainbow Bridge National Monument, and the difficulty, unsightliness of the protective dam, pumps, and tunnel, and the costs, and made a choice. The resultant specific prohibition as to the use of funds for protective works in the face of the inevitable water advance in the streambed under the Bridge has overridden the expression of intent in section 3 of the Storage Act as to Rainbow Bridge, and has overridden the specific reference to Rainbow Bridge in section 1 thereof. This indicates that Congress reached the decision not to modify the planned operation of the Glen Canyon Dam nor to authorize protective works to be built.
 
 
 53
 Congress, as we have seen, has also proceeded with the construction of other and related projects within the plan and provisions of the 1956 Storage Act. Several of these are completed and in operation including Navajo Lake, Curecanti, Flaming Gorge, and Fontenelle Reservoir. Thus the 1956 Storage Act and the Colorado River Basin Project Act are both currently being carried out as planned. There are many additional participating projects within the same plan which are being constructed or authorized by Congress. These are all dependent upon the design and operation of all the basic facilities, especially Lake Powell, at maximum capacity. This is a further indication of the position of Congress as to the operation of the Lake at capacity.
 
 
 54
 Considering the legislation passed by Congress with reference directly to Lake Powell and which also was predicated upon its use to capacity, together with committee reports directed specifically to the matters here concerned, there is a firm directive by Congress as to Rainbow Bridge National Monument specifically and as to Lake Powell. We have affirmative statements of position by Congress as to the two sections of the Storage Act in issue. This is all in the larger context of prior expressions of the concern of Congress for National Parks and Monuments, and the long series of legislative acts relative to such an important and urgent subject. The position of Congress as to such subjects has thus been made clear, and there resulted somewhat of a collision between such concern and the other important and urgent subject of the implementation of the Colorado River Compacts. This was resolved by Congress, not without some pain and suffering, as described above.
 
 The Authorites:
 
 55
 The basic statutory provisions in the Storage Act (43 U.S.C. Sec. 620 et seq.) with which we are concerned were inserted, as described above, in sections 1 and 3 of the comprehensive statute for the Colorado River Development. These provisions have there remained, but Congress has made them a nullity by the contrary provisions in the many appropriation acts which are supported by its declared reasons set forth in the formal committee reports.
 
 
 56
 Appropriation acts are just as effective a way to legislate as are ordinary bills relating to a particular subject. An appropriation act may be used to suspend or to modify prior Acts of Congress. In the case before us, there is both the denial of budget requests for the protective works, and also there is the direct prohibition against the use of money for such purposes. In addition, the committee reports describe the considerations examined and evaluated by Congress and the reasons for the action taken. This is thus not really a situation of repeal by implication as in Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351 but more a reversal of a previous position after considering it fully in the public hearings and after the members apparently came to the conclusion that the protective works would be more detrimental than the presence of water in the Monument. The committee reports indicate it was concluded there would be no physical damage to the Rainbow Bridge itself. This "repeal," if it should be called that, thus was straightforward, direct, and after hearings on the subject.
 
 
 57
 The Supreme Court, in United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 considered a proviso in an appropriation act that the funds in that or any other appropriation acts could not be used to pay reinlistment allowances. There was a specific statute providing for such allowances. The Court said:
 
 
 58
 "There can be no doubt that Congress could suspend or repeal the authorization contained in Section 9; and it could accomplish its purpose by an amendment to an appropriation bill, or otherwise."
 
 
 59
 The Court then cited United States v. Mitchell, 109 U.S. 146, 3 S.Ct. 151, 27 L.Ed. 887; Mathews v. United States, 123 U.S. 182, 8 S.Ct. 80, 31 L.Ed. 127 and United States v. Vulte, 233 U.S. 509, 34 S.Ct. 664, 58 L.Ed. 1071. The Court found the intention clear in Dickerson to suspend the allowance in the face of the statute authorizing it. In the above three cited cases, the Court was concerned with appropriation acts which related to the amount authorized to be paid to officials whose salary was fixed by a prior statute. The Court in Dickerson also referred to United States v. Langston, 118 U.S. 389, 6 S.Ct. 1185, 30 L.Ed. 164, which was an action to recover an unpaid balance of salary. The statute in Langston provided payment of $7,500 per year without any limitation in time, but subsequent appropriation acts provided for $5,000. The Court held the statute was not repealed by the appropriation acts, and said that it was not probable that Congress "should" at a subsequent date ". . . make a permanent reduction of his salary, without indicating its purpose to do so, either by express words of repeal, or by such provisions as would compel the courts to say that harmony between the old and the new statute was impossible." However, in the case before us the above description of the explanations in the committee reports, and in the legislation itself compel us to say that the provisions in the Storage Act were repealed. The facts in this case present more and stronger reasons for reaching the same result as reached in United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034. 84 L.Ed. 1356.
 
 
 60
 This case at issue here is significant, and different, however, from the cited cases, in that it does not involve a money provision in both statutes. Instead there is a reference to, and consideration of, what action should be taken with reference to the National Monument in which Congress had expressed concern, and the subsequent money legislation which could or could not have resolved the initial concern. The record shows that Congress evaluated the issues and reached a decision. This is sufficiently well documented in committee reports and otherwise to dictate the conclusion here reached. As the Court said in Dickerson:
 
 
 61
 "The meaning to be ascribed to an Act of Congress can only be derived from a considered weighing of every relevant aid to construction."
 
 
 62
 In addition to the Appropriation Acts, we have considered the other Acts of Congress, described above, which concerned other dams and projects within the scope of the Storage Act in reaching our conclusions.
 
 
 63
 We are urged in the briefs to also consider the doctrine of construction of statutes by administrative interpretation or practice as in Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616, but we do not consider this to be necessary. We have, however, considered United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181, on the matter of inconsistent statutes. There is little decisional authority on the issues but United States v. Dickerson, 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356, is applicable and directly rules on the effectiveness of appropriation acts.
 
 
 64
 The plaintiffs argue that the Dam and the Lake should be operated by the Bureau of Reclamation at a reduced level, and the Lake not be filed at any time above the 3,606 foot level. This is basically what the trial court directed. This argument, and the remedy sought, is directed to the executive branch and assumes that the above quoted provisions of the Storage Act be taken by such officials as originally enacted and without regard to what Congress may have since done.
 
 
 65
 Under such a position, the facilities at Glen Canyon, as related to others in the overall system, would be used to about one-half the design capacity. This in our opinion is contrary to the intention and to the directives of Congress. We have indicated above that the entire development was a balanced system or plan, considered as such by Congress, and so approved. To so radically change the effectiveness of the principal regulating reservoir is to prevent the attainment of the objectives of the Colorado River Compacts, and to prevent the fulfillment of the objectives of the Colorado River Storage Act and the Colorado River Basin Project Act.
 
 
 66
 The data in the record shows that at a level of 3,700 feet above sea level the total storage is about 27,000,000 acre feet and with an active capacity somewhat less. With the water level at 3,606 feet, the total storage is 14,749,000 acre feet with active storage again at a lesser figure. The affidavits in the record show that this large reduction in storage will substantially reduce the amount of water available to each of the Upper Basin states, and will impair the operation of many facilities already constructed and perhaps prevent use of some entirely. It will also make many more in the planning stage impracticable. This results not only from the lack of water storage to meet downriver obligations, but also from the resulting decline in power revenues.
 
 
 67
 With an attempted operation of Lake Powell with a maximum level at 3,606 feet, the initial problem arises, of course, from the fact that the Dam was not designed for such a limit. If the water cannot rise above 3,606 feet, the spillways cannot be used to accommodate the anticipated inflows of water into the Lake. The only way to handle such inflows is to use the power plant penstocks and outlet works passing water through the Dam as described above. The combined capacity of both these facilities is not sufficient to handle the expected wet year inflows nor even the normal year inflows. Thus to accommodate this additional water when operating with a 3,606 foot limit, the Lake level would have to be lowered in advance well below the 3,606 foot level. The record shows this lowering for a normal year should be to at least 3,589 feet and to 3,530 feet for a wet year. This would further reduce the storage by 1,000,000 acre feet and 5,500,000 acre feet. This reduction in level also reduces the head or pressure available for power with a resultant drop in the amount of electricity which can be generated, and causes doubt as to it as an annual firm source. This reduces the money available to the Upper Basin Fund for repayments and for operation of facilities as planned by Congress.
 
 
 68
 It is obvious that when Glen Canyon Dam is used to its full design capacity, the water level will be dropped at times below the 3,700 foot level by the required releases of water and by variations in the amount of runoff, but the spillways can be used. These declines will also reduce the power head, but this has been included in the planned power sales and the repayment schedules in the initial planning approved by Congress.
 
 
 69
 The Project Act (43 U.S.C. Sec. 1552(a)) required the formulation of operating criteria by the Bureau of Reclamation for the operation of Glen Canyon Dam and Hoover Dam to include the relationship of the two. This was also to insure that the terms of the Colorado River Compacts would be carried out. These criteria have been adopted, published, and reported to Congress. They set forth a plan of operation which is based on the full utilization of the capacity of Glen Canyon Dam. They further contain provision for approximate equalization of storage in the two Lakes, and again this can only be done when the total design capacity of Glen Canyon is used. This again we must assume was considered by Congress as the directed operating method.
 
 
 70
 In conclusion on the argument that Glen Canyon Dam should be operated at less than capacity, we again refer to the portion of this opinion which considers the elimination by Congress of provision for protective works for Rainbow Bridge, and to the termination by Congress, as to Rainbow Bridge, of the application of the general wording in section 3 of the Storage Act. This left the project as planned at the time Congress approved it, and this was to the full extent of its design capacity as now constructed in all respects. The officials of the Bureau of Reclamation who are charged with the operation of Glen Canyon Dam and Lake Mead have so operated the Dams, and this is correct. There was included a specific admonition by Congress to them that the power generation facilities be operated at their most productive rate (43 U.S.C. Sec. 620f).
 
 
 71
 The duties of the officials of the Bureau to follow the indications given by Congress in the Appropriation Acts, and otherwise, were referred to by the court in National Parks Ass'n v. Udall, No. 3904-62 (U.S.D.C., District of Columbia), and by the Solicitor of the Department of the Interior in his opinion at 70 I.D. 200, March 18, 1973.
 
 
 72
 We have considered the line of cases which are cited in and which include Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15, on the problem of sovereign immunity. This was with particular reference to the exceptions described in Malone v. Bowdoin, 369 U. S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168. In our opinion this case is very similar to Dugan v. Rank wherein the Court concluded that the action there filed against officials of the Bureau of Reclamation was an action against the sovereign because it interfered with "the public administration." Land v. Dollar, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209. In Dugan v. Rank, the Court found that the action of the Reclamation officials was within their statutory powers of condemnation.
 
 
 73
 Here, as we have above described, the actions of the defendant officials in the operation of Glen Canyon Dam at capacity is within the statutes as amended by Congress. Thus upon this determination, this action does fall within Dugan v. Rank.
 
 
 74
 The defendant officials have made computations presumably based upon levels previously surveyed. These were used in the evidence they presented to the trial court and to this court. These figures were not challenged by the plaintiffs, and have been used in this opinion. These same calculations also served as a basis for the many actions taken by Congress described above. Particularly the representation has been made that when the Dam is operated at maximum design capacity, the water depth under Rainbow Bridge, within the sides of Bridge Creek gorge, will not exceed forty-eight feet. It was on this figure also that the determinations were made by the Geological Survey and Congress that there would be no structural damage to the Arch. In view of the remote possibility that the surveys may not be entirely accurate or for any other reason the depth of water might there significantly exceed that figure, or in the event that some unexpected indication of structural damage to the Arch might become evident, it is directed that the trial court retain jurisdiction of this action for ten years after the date of the mandate herein. This retention of jurisdiction will permit the plaintiffs to seek further relief within that time if either of the indicated events occurs. For these purposes, the depth of the water under the Arch will be considered to have "significantly exceeded" the computed figure of forty-eight feet only if it reaches or exceeds an average depth of fifty-five feet measured along the thread of Bridge Creek for the width of the Arch and under the Arch.
 
 
 75
 Thus, it is ordered that the judgment of the trial court is vacated and set aside, and the case is remanded with directions that jurisdiction be retained as above provided.
 
 
 76
 McWILLIAMS, Circuit Judge (concurring in part and dissenting in part):
 
 
 77
 I fully concur in the body of Judge Seth's opinion and respectfully dissent only as to the form of the remand. For all of the reasons so cogently set forth in the majority opinion. I would reverse the judgment of the trial court and remand the case to that court with directions to enter judgment for the defendants. Accordingly, I dissent from the majority remand which directs the trial court to retain jurisdiction of the case for ten years and during that period of time to permit the plaintiffs to seek furtheir relief if future events would justify such. If future events warrant future litigation, it should be done in a new and different proceeding, in my view, and I would terminate the present controversy at this time.
 
 
 78
 WILLIAM E. DOYLE, Circuit Judge, (concurring).
 
 
 79
 I concur fully in the statements and conclusions of Judge Seth in the majority opinion and would add this very brief personal supplement to it.
 
 
 80
 The element which argues most strongly in favor of Judge Seth's opinion is the fact that the dam and reservoir which are a part of an interrelated system of dams and reservoirs along the Colorado go back many years. They commenced with the Colorado River Compact in 1923. During the entire period Congress has been aware of the problems. Since construction started in 1953, the problem of Water encroachment or invasion of the Rainbow Bridge Monument area has been specifically considered, and Congress has repeatedly refused to take protective measures. This was with full knowledge that use of the dam would necessarily result in encroachment of the water.
 
 
 81
 The full use of the dam to the level of 3,700 feet is essential to the generating of electricity and to the full beneficial use of the water by the upper basin states.
 
 
 82
 How then in the face of all of this evidence could Congress have intended that the Monument area be free of water when to give such an interpretation renders the dam and reservoir system of limited use?
 
 
 83
 It is to be emphasized that Rainbow Bridge is not in peril, and we will cross that bridge if and when that problem arises. Plaintiffs do not contend that the Bridge will even get wet. Their objection is to the presence of water in Bridge Creek which is in the gorge in the center of the Monument area-far from the Bridge. We are not unsympathetic to their concern because the water makes the area more accessible and interferes with full aesthetic enjoyment of the Monument area. That fact does not, of course, empower us to grant the relief. We must follow the law.
 
 
 84
 LEWIS, Chief Judge, with whom HILL, Circuit Judge, joins, dissenting:
 
 
 85
 This case brings to the court the necessity of considering several aspects of the continuing controversy between two ideologies, each desirable when viewed in isolation but necessarily clashing in practical application. In particular, the subject matter of the case involves whether the national welfare is best served by maximum conservation and industrial utility of the waters of the Colorado River or whether the national interest requires a modified use so as to protect the natural environment of the area designated as the Rainbow Bridge National Monument. So stated, the issue is a classic one for congressional consideration and not for judicial determination. And since I firmly believe that the posture of the case itself does not bring the controversy within the orbit of judicial concern, I must dissent. A majority of the court is, however, in agreement that Congress has already performed its full function and has clearly indicated that the present national interest requires maximum potential industrial use of the water of Lake Powell as contained back of the Glen Canyon Dam. To reach this result the majority must and does hold that section 1 and 3 of the Colorado River Storage Act of 1956 (43 U.S.C. Sec. 620, et seq., Public Law 485, 84 Cong.2d Sess.) have been repealed by implication or so modified as to be impotent under the express wording of the statutes as they still exist in the law. But however viewed I consider the action of the majority to be a deep trespass upon the prerogatives of Congress and a clear and dangerous violation of the doctrine of separation of powers.
 
 Section 1 of the cited Act provides:
 
 86
 That as part of the Glen Canyon Unit the Secretary of the Interior shall take adequate protective measures to preclude impairment of the Rainbow Bridge National Monument.
 
 
 87
 This section makes specific reference to the Rainbow Bridge National Monument but, as the main opinion recognizes, is completely severable in context from section 3, later discussed. However the majority places considerable emphasis upon the repeated refusal of Congress to provide funds for the Secretary of the Interior to implement section 1 as a supporting argument that section 3 has been repealed by implication. I do not agree. Congress authorizes many projects which die aborning from lack of funding or are not immediately implemented by funding. It is not for the courts to deny the validity of the statutory authorization simply from lack of funding. And that is particularly true in the case at bar. As pointed out in the main opinion, funding under section 1 has been specifically negated as to Rainbow Bridge Monument, to me a clear expression of Congress' recognition that section 1 is viable. The majority appears to recognize this in part and would seem to take some of the language contained in the appropriation acts as authority for holding that it is the present intent of Congress to protect only Rainbow Bridge and not the surrounding Monument area. In any event the decision breathes new life into protecting the Bridge proper and designates an allowable depth under the Bridge of fifty-five feet of water as the maximum to be tolerated, retaining jurisdiction for ten years apparently as guardian of the Bridge proper. Perhaps current events have persuaded the majority to impose this restriction. This year's run-off is extremely high and is now in progress. The capacity of Lake Powell has been or soon will be attained through the Glen Canyon Dam reaching its holding capacity. Water is now beneath the Bridge and is expected to reach a depth of forty-eight feet as estimated and the unexpected may occur. The protective order of the main opinion is understandable to me. But such extraordinary judicial action is without precedent and invades the legislative and administrative fields of authority. It is not for this court to say that the Bridge proper is to be protected from the waters of Lake Powell but that the Rainbow Bridge National Monument should not be so protected. Nor should this court volunteer to police the control of Lake Powell waters for a period of ten years or any other period for any purpose whatsoever, absent the necessity of using the injunctive power to enforce an act of Congress and then only under the most extraordinary circumstances. And I consider my views in this regard to be not only applicable to section 1 of the Act but also clearly applicable to section 3. 43 U.S.C. $4 620b provides in pertinent part:
 
 
 88
 It is the intention of Congress that no dam or reservoir constructed under the authorization of this chapter shall be within any national park or monument.
 
 
 89
 This mandate from Congress is not limited in any way to the problem at Rainbow Bridge. The statute is not ambiguous and, indeed, it is seldom that Congress deems it necessary to so specifically spell out its intention. The legislative history[1] of the Colorado Storage Act indicates that the inclusion of section 3 was necessary to assure its enactment. Congressman Aspinall (Colo.), then a leading proponent of the Storage Act, in reporting the amended project bill, said "And may I here and now advise the committee that the sponsors of the legislation promise and agree with the Members of the House that they shall keep their agreement with the conservationists of the Nation in this particular."[2] Mr. Aspinall commented further on this "agreement" as follows:
 
 
 90
 . . . We have entered into an agreement with the conservationists to the effect that we would not trespass upon any national park or national monument area in the construction of projects authorized under the provisions of this bill. I mention this because of a colloquy relative to the position of the Sierra Club. Since that time, I have talked to Mr. Brower, the Director of the Club, and he has assured me within the last 20 minutes that their opposition is withdrawn provided we place and keep within this bill the provisions that we will not treapass upon the national park or national monument areas.[3]
 
 
 91
 Ultimately the Conference Report of the two Houses stated:
 
 
 92
 The matter of retaining intact our national park system was an important issue in the consideration by Congress of this legislation. The House approved bill-(1) deleting the Echo Park Storage unit, (2) requiring "protective measures to preclude impairment of the Rainbow Bridge National Monument" and (3) expressing the "intention of Congress that no dam or reservoir constructed under the authorization of this act shall be within any national park or monument," . . . makes clear the intention of the House that there be no invasion or impairment of the national park system by the works authorized to be constructed under this legislation. The conference committee upheld the House position and adopted the House-approved language.[4]
 
 
 93
 We start then with an original congressional mandate, not expressly repealed by any subsequent Congress, that no reservoir shall be within any national monument and the undisputed fact that the Rainbow Bridge National Monument is now flooded even under the Bridge and with the judicial sanction of repeal by implication. To me, the judicial words "repealed by implication", by very definition, carry heavy overtones of erosion into the doctrine of separation of powers. So, too, the chosen words contained in the main opinion "reversal of a previous position" describe an equally dangerous judicial aggression.
 
 
 94
 Congress has not failed to amend or repeal the subject legislation through inadvertence. Eight different bills have been presented to the United States Congress during the past thirteen years in an attempt to amend the limiting language found in sections 1 and 3 of the Act.[5] Senator Moss has introduced six bills, all identical in nature, to amend section 3 by deleting "[i]t is the intention of Congress that no dam or reservoir constructed under the authorization of the Act shall be within any national park or monument." Senator Bennett and Representative McKay of Utah have each introduced a bill attempting to repeal the limiting language found in the Act. None of these bills has been reported out of committee, evidencing a lack of broad-based support for their passage in the Congress.
 
 
 95
 Furthermore, the very fact that these Congressmen felt it necessary to introduce amending legislation indicates, at least on their part, no assurance that Congress has in any manner repealed the sections in question. Quite to the contrary, remarks of both Senator Bennett and Senator Moss contained in the Congressional Record manifest a belief that direct repeal is necessary.[6]
 
 
 96
 In Georgia v. Pennsylvania R.R., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051, the Supreme Court was presented with the question of whether the Sherman Act was impliedly repealed with respect to those carriers under the jurisdiction of the I.C.C. by the Interstate Commerce Act. The Court, in rejecting the implied repeal argument, noted that one factor in its decision was the fact that there had been congressional proposals to confer immunity on interstate carriers from the anti-trust laws, but these proposals had not been adopted. The Court stated: "Twice Congress has been tendered proposals to legalize rate-fixing combinations. But it has not adopted them. In view of this history we can only conclude that they have no immunity from the anti-trust laws." The same types of explicit, unsuccessful attempts to legislatively repeal section 3 of the Colorado River Storage Project Act are present in this case.
 
 
 97
 The Supreme Court has consistently stated that judicial interpretation is disfavored as a means of establishing a repeal of legislation. In one case only has repeal by implication been upheld. Mathews v. U. S., 123 U.S. 182, 8 S.Ct. 80, 31 L.Ed. 127. Such implied repeal has been rejected in a multitude of cases. See Universal Interpretive Shuttle Corp. v. Washington Metro. Area Transit Commission, 393 U.S. 186, 89 S.Ct. 354, 21 L.Ed.2d 334; Jones v. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189; Amell v. United States, 384 U.S. 158, 86 S.Ct. 1384, 16 L.Ed.2d 445; United States v. Welden, 377 U.S. 95, 84 S.Ct. 1082, 12 L.Ed.2d 152; United States v. Zacks, 375 U.S. 59, 84 S.Ct. 178, 11 L.Ed.2d 128; United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915; Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389; Mercantile Nat'l Bank at Dallas v. Langdeau, 371 U.S. 555, 83 S.Ct. 520, 9 L. Ed.2d 523; Bulova Watch Co. v. United States, 365 U.S. 753, 81 S.Ct. 864, 6 L. Ed.2d 72; Fourco Glass Co. v. Transmirra Products Corp., 353 U.S. 222, 77 S.Ct. 787, 1 L.Ed.2d 786; Rosenberg v. United States, 346 U.S. 273, 73 S.Ct. 1152, 97 L.Ed. 1607; F.T.C. v. A.P.W. Paper Co., 328 U.S. 193, 66 S.Ct. 932, 90 L.Ed. 1165; United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; Posadas v. Nat'l City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351; United States v. Noce, 268 U.S. 613, 45 S.Ct. 610, 69 L.Ed. 1116; United States v. Greathouse, 166 U.S. 601; 17 S.Ct. 701, 41 L.Ed. 1130; Wood v. United States, 16 Pet. 342, 10 L.Ed. 987. United States v. Dickerson, 310 U.S. 554, 60 S. Ct. 1034, 84 L.Ed. 1356, and other cases cited in the main opinion, can give no comfort to the result reached by the majority. Any arguable impact flowing from Dickerson must be limited to section 1 of the Storage Act and cannot premise an implied repeal of section 3. Section 3 is self-sustaining and needs no supplement by appropriation or otherwise for its continued vitality.
 
 
 98
 In simple summation the court has done that which the Congress has many times refused to do and has, to all practical effect, enacted legislation which is actually pending before Congress for its consideration. Such judicial action is unprecedented and while the decision may be heralded by some as a good pragmatic solution to a difficult and controversial problem this is not a judicial prerogative. Current events in other unrelated fields indicate that more problems are created than solved by a softening of the basic concept of a firm and strict application of the doctrine of separation of powers.
 
 
 99
 I would affirm.
 
 
 
 [1]
 The great bulk of the evidence in this case, and the briefs of all the parties, is and are primarily directed to the damage and waste that can be anticipated from either result reached in this decision. There can be no doubt that great economic benefits lie in the maximum use of the water of Lake Powell to create hydroelectric power and for other beneficial uses particularly applicable to the Four Corner States. So, too, the flooding of Rainbow Bridge Monument will inevitably result in environmental damage the extent of which is dependent upon the amount and duration of the flooding. This damage is claimed to result to all the people of the nation because of the dedication of the Monument and is thus not localized to the interests of particular states. For an elaborate discussion of the value of Rainbow Bridge to posterity reference can be made to the opinion of the trial court. The issue is patently one for congressional consideration and, under my view, need not be discussed
 So, too, the parties have comprehensively briefed the legislative history of the subject Act and all subsequent legislation. The main opinion treats this approach to the case in a conclusionary manner and I do not think it is necessary to elaborate in this regard. It is sufficient to say that I completely disagree that section 3 has been repealed by implication.
 
 
 [2]
 102 Cong.Rec. 3510 (1956)
 
 
 [3]
 102 Cong.Rec. 3504 (1956)
 
 
 [4]
 102 Cong.Rec. 5768 (1956)
 
 
 [5]
 Senator Moss has introduced: S. 3180 (1960). S. 175 (1961), S. 333 (1963), S. 1555 (1967), S. 307 (1969), S. 1057 (still pending before the Senate). Senator Bennett introduced S. 1188 in 1961 and Congressman McKay has introduced H.R. 6255 which is now pending before the House
 
 
 [6]
 Senator Bennett, speaking before the Senate in 1961 upon introducing S. 1188 to amend the Act, stated:
 In addition, Secretary Udall proposes that water should be permitted to back up into the monument area, feeling that this is preferable to desecrating the great wilderness area surrounding Rainbow Bridge with dams and pumps and with roads necessary to construction of the dams. This will require amendment of the Upper Colorado Act, and my bill embodies such amendments. (107 Cong.Rec. 3039 (1961).)
 Senator Moss has also made similar comments before the Senate. See 107 Cong.Rec. 193 (1961); 109 Cong.Rec. 609 (1963).