Lamarr BADONI, Teddy Holiday, Betty Holiday, Jessie Yazzie Black, Jimmy Goodman, Begay Bitsinnie, Shonto Chapter of the Navajo Nation, Navajo Mountain Chapter of the Navajo Nation, and Inscription House Chapter of the Navajo Nation, Plaintiffs,

v.

R. Keith HIGGINSON, Commissioner, Bureau of Reclamation; Ronald H. Walker, Director, National Park Service; Cecil V. Andrus, Secretary of the Interior, Defendants,

and

State of Utah, Central Utah Water Conservancy District, Colorado River Water Conservation District, Southwestern Water Conservation District, and State of Colorado, Defendants in Intervention.

No. C-74-275.

United States District Court,
D. Utah, C. D.

Dec. 30, 1977.

Eric P. Swenson, Mexican Hat, Utah, Richard W. Hughes, Window Rock, Ariz., Robert L. Miller, Tuba City, Ariz., for plaintiffs.

Ronald L. Rencher, U.S. Atty., and Brent D. Ward, Asst. U.S. Atty., Salt Lake City, Utah, for United States defendants.

Edward W. Clyde, Richard L. Dewsnup, and Dallin W. Jensen, Asst. Atty. Gen., Salt Lake City, Utah, for defendants in intervention State of Utah and Central Utah Water Conservancy Dist.

Kenneth Balcomb, Glenwood Springs, Colo., for defendant in intervention Colorado River Water Conservation Dist.

Andrew R. Hurley, Salt Lake City, Utah, Resident Atty., for defendants Colorado River Water Conservation Dist. and The Southwestern Water Conservation Dist.

Clyde O. Martz and Raphael J. Moses, Sp. Asst. Attys. Gen., Denver, Colo., for defendant in intervention State of Colo.

Frank E. Maynes, Durango, Colo., for defendant in intervention The Southwestern Water Conservation Dist.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ALDON J. ANDERSON, Chief Judge.

The instant action was commenced on September 3, 1974, by eight individual Navajo Indians and by three Navajo "Chapters." The Navajo "Chapters" are local organizations of the Navajo Nation, each consisting of all the adult members of its respective communities. One of the original eight individual plaintiffs has died, and one has been dismissed from the action. Three of the individual plaintiffs are qualified and recognized among their people as medicine men—i. e., religious leaders of considerable stature among the Navajo, learned in Navajo history, mythology and culture, and practitioners of traditional rites and ceremonies of ancient origin. The remaining three individuals are enrolled members of the Navajo Tribe of Indians and reside in the general area of Rainbow Bridge National Monument in Southern Utah.

The original party defendants are various officials within the United States Department of the Interior. On February 26, 1975, this court granted the motions of the Colorado River Water Conservation District, the Southwestern Water Conservation District, the State of Colorado, the State of

Utah, and the Central Utah Water Conservancy District to intervene as defendants.

In their amended complaint, plaintiffs state that under certain operating criteria promulgated by defendant Andrus or his predecessor, the waters of Lake Powell are encroaching upon the Rainbow Bridge National Monument, and that defendants Higginson and Walker have licensed several persons and corporations to operate tour boats on Lake Powell, several of which make daily trips to Rainbow Bridge, and have in other ways facilitated the development of tourism in the Monument area. Against this background, plaintiffs assert three claims for relief: First, that the flooding of the Rainbow Bridge National Monument has resulted in the destruction and desecration of many Navajo gods and sacred areas in the vicinity and has thereby violated plaintiffs' right to the free and uninhibited exercise of their religious beliefs and practices, as guaranteed by the First Amendment; second, that defendants have violated and are violating section 1 of the Colorado River Storage Project Act which provides that defendants ". . . shall take adequate protective measures to preclude impairment of Rainbow Bridge National Monument", and third, that defendants' operation of the Glen Canyon Dam and Reservoir is a continuing major federal action that significantly affects the quality of the human environment, within the meaning of the National Environmental Policy Act (NEPA) and that defendants have not filed the required environmental impact statement concerning their actions. To remedy the situation, plaintiffs ask that this court issue a permanent injunction against defendants, ordering them to take actions to preclude the impairment of the Rainbow Bridge National Monument and the surrounding Glen Canyon National Recreation Area and plaintiffs' interest therein, and to cease further major actions with respect to the operation of the dam and reservoir until the required environmental impact statement is completed.

On various grounds that are discussed below, the following defendants filed properly supported motions for summary judg-ment: On February 25, 1977, defendant-intervenors State of Utah and Central Utah Water Conservancy District; and on February 28, 1977, the original federal defendants and defendant-intervenors Colorado River Water Conservation District and Southwestern Water Conservation District. On February 28, 1977, defendant-intervenor State of Colorado filed alternative motions under Rule 12(c) and Rule 12(d), *Federal Rules of Civil Procedure*. Because matters outside the pleadings have been presented to and not excluded by the court, the court will treat the State of Colorado's Rule 12(c) motion for judgment on the pleadings as one for summary judgment. On May 23, 1977, plaintiffs filed a memorandum in opposition to the various motions of defendants and intervenors. The matter was argued before the court at length on September 19, 1977. Having fully and carefully considered the matters presented by way of written memorandum and oral argument in the light most favorable to plaintiffs, the court deems itself fully advised, and concludes that federal jurisdiction is properly invoked under 28 U.S.C. § 1331 and that the respective motions for summary judgment must be granted. The three claims of plaintiffs and the reasons for their failure are discussed in the order in which they were presented to the court.

### 1. *Free Exercise of Religion*

The factual backdrop of plaintiffs' First Amendment claim is developed in plaintiffs' amended complaint and memorandum in opposition to the motions for summary judgment. Essentially, it is claimed that certain geological formations in the Rainbow Bridge area have held positions of central importance in the religion of the Navajo people of the Navajo Mountain area for at least 100 years. These shrines, which are regarded as the actual incarnate forms of Navajo gods, have performed protective and rain-giving functions for generations of Navajo singers. Ceremonies have been performed in Bridge Canyon near Rainbow Bridge, and water from the springs there has been used for other ceremonies. Plain-

tiffs allege that the flooding of Bridge Canyon in the vicinity of Rainbow Bridge and the greatly increased tourist traffic due to defendants' actions have resulted in the following specific infringements upon plaintiffs' First Amendment rights: the destruction of holy sites; the drowning of entities recognized as gods by the plaintiffs; prevention of plaintiffs from performing religious ceremonies; desecration of holy sites, especially abodes of gods of the plaintiffs, by tourists; and, by virtue of all of this, injury to the efficacy of plaintiffs' religious prayers, and entreaties to their remaining gods. Plaintiffs stress that the result of this sacrilege has been, and will continue to be, severe emotional and spiritual distress for plaintiffs and Navajo people generally, all of which is violative of plaintiffs' rights to the free exercise of their religious beliefs and practices. Plaintiffs request this court to order defendants to take appropriate steps to operate Glen Canyon Dam and Reservoir in such a manner that the important. religious and cultural interests of plaintiffs will not be harmed or degraded, and to issue rules and regulations to prevent further destruction and desecration of the Rainbow Bridge area by tourists.

■ The First Amendment claims of plaintiffs constitute a unique challenge to the projects and actions of defendants and present to this court some rather novel questions of law. Nevertheless, it is the opinion of the court that plaintiffs' free exercise of religion claims must fail on two alternative grounds.

First, as defendants have pointed out, plaintiffs do not allege nor do they have any property interest in the Rainbow Bridge National Monument. It is undisputed that even though the various uses of the area have fluctuated over the years and the monument area is within the present boundaries of the Navajo Indian Reservation, the 160-acre monument has never actually been a part of the Navajo Reservation. The monument was created by Presidential Proclamation on May 30, 1910, by President William H. Taft in accordance with authority conferred upon him by the Act of June 8, 1906, 16 U.S.C. § 431. Since that time, none of the fluctuations of uses of the land purported to affect the monument, and the site has been held in federal ownership as a National Monument. It is part of the National Park System administered by the National Park Service. Any aboriginal proprietary interest that the Navajos may have held in this land would have been extinguished by the entry of the white man in earlier years. *See Northwestern Bands of Shoshone Indians v. United States*, 324 U.S. 335, 339, 65 S.Ct. 690, 89 L.Ed. 985 (1945). Because plaintiffs have no property interest in the land that is the subject of this action, defendants argue that plaintiffs' First Amendment claim ". . . does not come within a country mile of any cognizable legal theory upon which relief can be granted." The court feels that the lack of a property interest is determinative of the First Amendment question and agrees with defendants that plaintiffs have no cognizable claim under the circumstances presented.

Despite the numerous cases presented to the court, all of which stand for valid general First Amendment principles, the parties concede that there are no cases directly in point and that the case most analogous to the present one is *Pillar of Fire v. Denver Urban Renewal Authority*, 181 Colo. 411, 509 P.2d 1250 (1973). There, the Denver Urban Renewal Authority filed a petition to condemn the first permanent church building of the Pillar of Fire Church which was claimed to have great historical and religious significance. The Colorado Supreme Court thoroughly considered the First Amendment issues, directed the application of the balancing of interests test, and remanded the case for an evidentiary hearing. [On remand it was held that the city could condemn and acquire the church. *Denver Urban Renewal Authority v. Pillar of Fire*, 552 P.2d 23 (Colo.1976).] The salient point for the present purposes, however, is that even in this most relevant case the property in dispute was owned by the individuals and organization which sought its protection rather than by a third person. Thus, the case is inapposite here.

To hold that a person may assert First Amendment rights to the disruption of the property rights of others, even if the other person is a government, could and likely would lead to unauthorized and very troublesome results. An example suggested by defendants Utah and the Central Utah Water Conservancy District is exaggerated but instructive and illustrative of the problem presented by plaintiffs' claim: A person might sincerely believe that he or a predecessor encountered a profound religious experience in the environs of what is now the Lincoln Memorial in Washington, D. C., and that experience might cause him to believe that the Lincoln Memorial is therefore a sacred religious shrine to him. That person, however, could hardly expect to call upon the courts to enjoin all other visitors from entering the Lincoln Memorial in order to protect his constitutional right to religious freedom. The weakness in plaintiffs' claim is apparent. Thus, even assuming that all of the assertions as to the actuality and sincerity of plaintiffs' beliefs are true,* the court finds that the assertions do not give rise to a cognizable First Amendment claim under the circumstances of the instant case.

■ Second, even if plaintiffs' claims were cognizable First Amendment claims, the court concludes that under the United States Supreme Court's balancing of interests test the interests of defendants would clearly outweigh the interests of plaintiffs. Both plaintiffs and defendants agree that the balancing of interests test is applicable in the instant action and rely upon the case of *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In *Yoder*, members of the Amish faith successfully claimed that the state's compulsory education laws violated their right to the free exercise of their religion. The Supreme Court made it clear that its balancing analysis requires the following once a burden on the free exercise of religion is demonstrated:

. . . it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause.

406 U.S. at 214, 92 S.Ct. at 1532. Thus, a balancing analysis requires inquiry into the following three areas: first, the existence of a bona fide and sincere religious claim; second, the nature of the claimed religious interests; and third, the nature of the state interests.

In *Yoder* the Supreme Court held that the Amish claim qualified for protection under the Constitution because,

. . . the record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of *deep religious conviction, shared by an organized group, and intimately related to daily living.* (emphasis added)

406 U.S. at 216, 92 S.Ct. at 1533. The present plaintiffs have gone to great lengths to construct a cognizable action out of their claim of First Amendment religious infringement. Again, however, even assuming that all of the assertions as to the existence of plaintiffs' beliefs are true,* it is apparent that these interests do not constitute "deep religious conviction[s], shared by an organized group and intimately related to daily living."

Far short of this, pleading and discovery documents filed in this case indicate, among

---

\* On July 18, 1977, plaintiffs filed an affidavit and lengthy monograph of Dr. Karl W. Luckert, a purported expert in the field of Navajo culture and belief, concerning the history and nature of plaintiffs' religious beliefs. On September 2, 1977, defendant United States filed a motion to strike the affidavit and monograph on the grounds that the documents fail to comply with Rule 56(e), *Federal Rules of Civil Procedure*, in that the documents would not be admissible in evidence. Plaintiffs filed a response to this motion on September 19, 1977. For the purposes of this order only and without ruling on the merits of the motion to strike, the court accepts as established and true all of the facts and conclusions in the affidavit and monograph of Dr. Luckert. And in light of the granting of the motions for summary judgment of defendants, the motion to strike is rendered moot.

other things, that the medicine men who allegedly conduct the religious rites involving Rainbow Bridge and the surrounding areas are not recognized by the Navajo Nation as such. Also, the training of these medicine men has not been tribally organized or carried out, and took place years ago. The individually-named plaintiffs have attended a combined total of nine religious ceremonies within the boundaries of Rainbow Bridge Monument since 1965 (question 5(c), at p. 7) and the same plaintiffs had attended religious ceremonies within the boundaries of Rainbow Bridge Monument only infrequently prior to 1965 (question 5(d), at p. 8). None of the individually-named plaintiffs answering interrogatories could identify times at which other ceremonies were held or how many individuals attended (question 5(i)(1), at p. 9). The eight individually-named plaintiffs had visited the monument a combined total of eleven times since 1965, and such visits were infrequent. Taking the information supplied by the plaintiffs as true, there is nothing to indicate that at the present time the Rainbow Bridge National Monument and its environs has anything approaching deep, religious significance to any organized group, or has in recent decades been intimately related to the daily living of any group or individual. Rather, the record supplied by the plaintiffs is to the contrary.

As to the nature of plaintiffs' religious interest, two factors considered by the Court in *Yoder* with respect to the nature of the religious interest were the relationship of the religious practice in question to the Amish way of life and the history of consistency of the practice as an indication of the sincerity of the practitioners. The Navajo plaintiffs claim that their religious interest involves the use of Rainbow Bridge and its surrounding areas for religious ceremonies. Plaintiffs claim that the earlier cited infringements of their First Amendment rights result from defendants' permitting Lake Powell reservoir to fill to a level at which reservoir waters enter into Rainbow Bridge National Monument, flood Bridge Canyon, and allow tourist access to the monument. Plaintiffs fail, however, to demonstrate in any manner a vital relationship of the practices in question with the Navajo way of life or a "history of consistency" which would support their allegation of religious use of Rainbow Bridge in recent times.

In an attempt to explain the absence of religious ceremonies at Rainbow Bridge in recent times, plaintiffs state in their memorandum that the "navajo ceremonies . . . are not periodic ceremonies . . . [but] are performed when needed, and requested by an individual or family." This statement of counsel fails to carry the burden imposed by *Yoder* of demonstrating a religious interest sufficient to carry the day here. Plaintiffs' answers to interrogatories indicate that few, if any, ceremonies have been conducted since 1965, even though the waters of Lake Powell did not enter the monument until 1971. In sum, the alleged interests of plaintiffs have not been established.

The nature of defendants' interest, on the other hand, lies in the continued operation of Glen Canyon Dam and the Lake Powell reservoir consistent with current statutory and regulatory authority. This interest is fully described in the opinion of the Court of Appeals for the Tenth Circuit in *Friends of the Earth v. Armstrong*, 485 F.2d 1, 4–6 (10th Cir. 1973). Basically, the interest concerns water storage, power generation, state's rights, international treaty rights, the public's proprietary rights and the benefits in water distribution and use which were to be returned to the Indians, and the government's public trust responsibility. With regard to water and power development, the Court of Appeals stated as follows at 485 F.2d 6:

From the above description of the legislation, it is apparent that Lake Powell is an important element or link in the Colorado River water and power development. It cannot be considered alone as all the existing projects in the Upper Basin, and the planned ones, are interrelated and interdependent. The projects have different purposes and functions, but are dependent on Lake Powell to

provide basic storage necessary to fulfill the delivery requirements to the downstream states and Mexico, especially in dry years. If these requirements can be so met by use of this storage, the upper states can develop the water allocated to them for irrigation and other projects. If this storage is reduced by a limitation on the level of Lake Powell, some projects built, and some authorized, are at least impaired. This interrelation created by the comprehensive plan for development is rather delicate and can be disturbed if the capacity of by far the largest storage or regulating unit is reduced significantly. The total development plan was given extensive consideration by water experts and by Congress. See 84th Cong. 1st Sess. (1955), S.Report 128, and 84th Cong. 2d Sess. (1956), House Report 1087. The repayment schedules and power revenues were also fully integrated into the plan. See 2 U.S.Code Cong. & Admin. News, 84th Cong. 2d Sess. (1956), pp. 2352–59.

Furthermore, the Court of Appeals stated the following with respect to the specific question of power generation, at 11:

> In conclusion on the argument that Glen Canyon Dam should be operated at less than capacity, we again refer to the portion of this opinion which considers the elimination by Congress of provision for protective works for Rainbow Bridge, and to the termination by Congress, as to Rainbow Bridge, of the application of the general wording in section 3 of the Storage Act. This left the project as planned at the time Congress approved it, and this was to the full extent of its design capacity as now constructed in all respects. The officials of the Bureau of Reclamation who are charged with the operation of Glen Canyon Dam and Lake Mead have so operated the Dams, and this is correct. There was included a specific admonition by Congress to them that the power generation facilities be operated at their most productive rate (43 U.S.C. § 620f).

It is clear that the state interests in the operation of the dam and reservoir in the manner prescribed by statute and regulation are weighty and not overcome by the relatively weak showing made by plaintiffs.

### 2. Section 1 of the Colorado River Storage Project Act

Section 1 of the Colorado River Storage Project Act, 43 U.S.C. § 620, ends with the proviso: "That, as part of the Glen Canyon Unit the Secretary of the Interior shall take adequate measures to preclude impairment of the Rainbow Bridge National Monument." In *Friends of the Earth v. Armstrong*, 485 F.2d 1 (10th Cir. 1973), *cert. denied*, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974), the United States Court of Appeals for the Tenth Circuit held, after extensive litigation, that action taken by Congress after the passage of the Storage Act demonstrated that the portion of section 1 that refers to Rainbow Bridge had been repealed. Nevertheless, plaintiffs, with an apparent erroneous concept of what is required of them as advocates, strongly contend that section 1 has not, in fact, been repealed. Plaintiffs quote language from *Friends of the Earth* stating that the case was "not really a situation of repeal by implication . . . but more a reversal of a previous position." 485 F.2d at 9.

■ In so arguing, however, plaintiffs quote the language completely out of context and ignore the clear holding of the case. In *Friends of the Earth*, the court reviewed at length the various statutes and circumstances that demonstrated that section 1 had been repealed by subsequent enactments. To put the language quoted by plaintiffs back in context, the court concluded as follows:

> This is thus not really a situation of repeal by implication . . . but more a reversal of a previous position after considering it fully in the public hearings and after the members apparently came to the conclusion that the protective works would be more detrimental than the presence of water in the Monument. . . . *This "repeal," if it should be called that, thus was straightforward, direct, and after hearings on the subject.*

485 F.2d at 9 (emphasis added). In view of this precise holding, it is difficult to see how plaintiffs can seriously assert that section 1 can be resurrected and construed in any manner to aid them in this action.

### 3. Applicability of NEPA

Plaintiffs' third and final claim is that the operating criteria for Glen Canyon Dam and Lake Powell must be subjected to an environmental impact study and statement under the mandate of section 102(2)(C) of the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C). It is plaintiffs' position that the finalization of the operating criteria, which finally determine how water in the water project is to be distributed among the upper basin reservoirs, and when and how that water is to be released to the lower basin, was a major federal action having a significant effect upon the quality of the human environment. Since defendants have not issued an environmental impact statement (EIS) concerning the environmental impact of such actions, this court is asked to halt such further major actions with respect to the operation of the dam and reservoir pending the completion of an EIS.

In Grand Canyon Dorries, Inc. v. Walker, 500 F.2d 588 (10th Cir. 1974), plaintiffs sought injunctive relief against the Secretary of the Interior and various other officials on grounds very similar to those urged by the present plaintiffs. Specifically, the Grand Canyon Dorries plaintiffs alleged that the continuing operation of the Glen Canyon Dam is a major federal action requiring an EIS pursuant to 42 U.S.C. § 4321 et seq. The Tenth Circuit held, however, that this issue was not properly before the court since the Department of Interior had not at that time taken action sufficient to establish the Department's position regarding whether and how NEPA should be applied to the operation of the dam. The court concluded that only when the Department ". . . has exercised the broad discretion conferred by the Act and the Guidelines will the issues be ripe for judicial determination." 500 F.2d at 590.

In an attempt to distinguish the instant action from the Grand Canyon Dorries case, plaintiffs claim that the record in this case shows that the issues presented in Grand Canyon Dorries are now ripe for decision because plaintiffs have requested that the Department prepare an EIS and because some work has been done by defendants toward deciding whether a formal EIS should be prepared. The court finds, however, that plaintiffs' reliance upon the dicta in the Tenth Circuit decision to the effect that parties should request that the Department consider the preparation of an EIS, and upon any efforts thus far undertaken by the Department, is misplaced. The clear import of Grand Canyon Dorries, which obviously is binding upon this court, is that the Department must assemble the relevant information and take a position of sufficient clarity and finality that it can fairly be said that judicial review of that position would be justified and meaningful. There is nothing in the record that indicates that the Department has at this time taken a position at all, let alone one that would meet this standard. To the contrary, it appears from the memoranda and affidavits on file herein that the Department is still actively considering and formulating its position regarding the applicability of NEPA and the necessity of an EIS in the Glen Canyon situation. Thus, this court concludes, as did the Tenth Circuit in Grand Canyon Dorries, that the question of the applicability of NEPA to the ongoing operation of the Glen Canyon Dam and Reservoir is not properly before the court.

The court would like to add, however, that even if the NEPA question were properly presented at this time, the court is of the opinion that an EIS would not be required in the present case for two reasons. First, it appears that the operation of the dam and reservoir are so strictly limited by congressional and contractual constraints that defendants' actions are merely ministerial actions which do not rise to the level of major federal actions. See Sierra Club v. Morton, 400 F.Supp. 610 (N.D.Cal. 1975); Morris v. Tennessee Valley Authority, 345 F.Supp. 321 (N.D.Ala.1972); Lee v. Resor, 348 F.Supp. 389 (M.D.Fla.1972).

In *Morris, supra,* the court provides a helpful analysis of legal issues similar to those in the instant case. That case involved a dam authorized by the Tennessee Valley Authority Act of 1933 (16 U.S.C. § 831c) and completed prior to the enactment of NEPA. Plaintiffs claimed that defendants' operation of Wilson Dam caused the waters of the reservoir to rise and fall, causing refuse matter to accumulate in the sloughs adjacent to plaintiffs' land. Plaintiffs sought relief under NEPA. The court dismissed this argument in summary fashion, stating,

> . . . TVA has made no proposal for such a major action (nor has it taken any such major action) with respect to the matters involved in this case since NEPA became law on January 1, 1970. *TVA has simply continued to operate its dams, including Wilson Dam, in accordance with the statutory directive contained in section 9a of the TVA Act.* NEPA has no application to agency actions settled long before NEPA's enactment . . . (emphasis added).

345 F.Supp. at 324.

In *Sierra Club v. Morton, supra,* the court reached a similar result.

> With respect to the Delta and Tracy Pumping Plants, it *is convenient to distinguish the operation of these facilities up to their present maximum capacities from any future expansion of the two facilities.* In regard to the former, plaintiffs vigorously assert that because total annual pumping at both structures will increase in future years to reach their present maximum capacities, these increases alone will be sufficient to require the filing of an EIS. The Court finds this assertion untenable. It is neither supported in logic nor by the case law. Although NEPA is applicable to further incremental major federal actions occurring subsequent to its effective date even though a project was initiated prior to that date, *once a project is complete, there can be no further major action because at the time of completion, the project was capable of operating at maximum capacity and the agencies intended to operate it at full capacity. See generally Morris v. TVA,* 345 F.Supp. 321, 324 (N.D.Ala.1972). See CEQ Guidelines § 1500.13. If NEPA were construed to require application to ongoing projects which were fully completed prior to January 1, 1970, most federal agencies would become trapped in an endless web of EIS paperwork. Such an interpretation was not intended by Congress and is not supported by the case law.

400 F.Supp. at 645 (emphasis added). Similarly, NEPA was not intended by Congress to trap the continuing operation of Glen Canyon Dam and Lake Powell in an endless web of EIS paperwork once the project was completed and capable of operating at maximum capacity.

Second, the relief sought by plaintiffs is not within defendants' available alternatives. The purpose behind the provisions of 42 U.S.C. § 4332(2)(C) which require filing an EIS "on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" is to require that decisions of responsible officials be made after appropriate and careful consideration of environmental aspects of proposed actions. *See, e. g., Movement Against Destruction v. Volpe,* 361 F.Supp. 1360, 1383 (D.Md.1973), affirmed, 500 F.2d 29 (4th Cir. 1974). And the courts have consistently interpreted NEPA to require a consideration of alternatives which are reasonable and do not demand what is not meaningfully possible. *Life of the Land v. Brinegar,* 485 F.2d 460 (9th Cir.), *cert. denied,* 414 U.S. 1052, 94 S.Ct. 558, 38 L.Ed.2d 341 (1973); *I–291 Why? Association v. Burns,* 372 F.Supp. 223 (D.Conn.1974), *aff'd,* 517 F.2d 1077 (2d Cir. 1975); *City of Romulus v. Wayne County,* 392 F.Supp. 578 (D.C.Mich.1975).

Preparation at this time of a site-specific EIS on the operation of Glen Canyon Dam would be of no benefit to the plaintiff because there are no reasonable alternatives which would afford plaintiffs the relief they seek. *See Friends of the Earth v. Armstrong, supra.* Since, for reasons which

**650**

have already been discussed, withdrawal of Lake Powell from the monument or the construction of protective works is no longer meaningfully possible, analysis of these alternatives would be only a "hollow exercise." *See Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission*, 146 U.S.App.D.C. 33, 52, 449 F.2d 1109, 1128 (1971). Wherefore,

IT IS HEREBY ORDERED that the motions for summary judgment of the respective defendants are granted and, in accordance with the above opinion, the motion to strike the affidavit and monograph of Karl W. Luckert is moot.*