638 F.2d 172
 15 ERC 1305, 11 Envtl. L. Rep. 20,204
 Lamarr BADONI, Teddy Holiday, Betty Holiday, Jessie Yazzie
Black, Jimmy Goodman, Begay Bitsinnie, Shonto Chapter of the
Navajo Nation, Navajo Mountain Chapter of the Navajo Nation,
and Inscription House Chapter of the Navajo Nation,
Plaintiffs-Appellants,
v.
R. Keith HIGGINSON, Commissioner, Bureau of Reclamation;
Ronald H. Walker, Director, National Park Service;
Cecil V. Andrus, Secretary of the
Interior, Defendants-Appellees,
State of Utah; Central Utah Water Conservancy District;
Colorado River Conservation District; Southwestern
Water Conservation District; and State
of Colorado, Defendants in
Intervention-Appellees.
 No. 78-1517.
 United States Court of Appeals,
Tenth Circuit.
 Argued Jan. 24, 1980.
Decided Nov. 3, 1980.
Rehearing Denied Dec. 19, 1980.
 
 Richard W. Hughes of Luebben, Hughes & Kelly, Albuquerque, N. M. (Eric P. Swenson, Mexican Hat, Utah, with him on brief), for plaintiffs-appellants.
 Anne S. Almy, Atty., Dept. of Justice, Washington, D. C. (Anthony C. Liotta, Acting Asst. Atty. Gen., Ronald L. Rencher, U. S. Atty., Salt Lake City, Utah, and Robert L. Klarquist, Atty., Dept. of Justice, Washington, D. C., with her on brief), for defendants-appellees.
 Dallin W. Jensen, Asst. Atty. Gen., State of Utah, Salt Lake City, Utah (Richard L. Dewsnup, Asst. Atty. Gen., State of Utah, and Edward W. Clyde, Salt Lake City, Utah, with him on brief, for appellees-in-intervention State of Utah and Central Utah Water Conservancy District.
 Frank E. Maynes, Durango, Colo., and Andrew R. Hurley, Salt Lake City, Utah, for appellee-in-intervention Southwestern Water Conservation District.
 Clyde O. Martz, Sp. Asst. Atty. Gen., State of Colorado, Denver, Colo., for appellee-in-intervention State of Colorado.
 Kenneth Balcomb, Glenwood Springs, Colo., and Andrew R. Hurley, Salt Lake City, Utah, for appellee-in-intervention Colorado River Water Conservation District.
 Before McWILLIAMS, BREITENSTEIN and LOGAN, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 This is an appeal from an order granting summary judgment, which effectively denied relief to Indian plaintiffs making constitutional and statutory claims against federal officials. We are asked to determine whether the religion clauses of the First Amendment apply to the government's management of the Rainbow Bridge National Monument and the Glen Canyon Dam and Reservoir, and whether an environmental impact statement concerning operation of the Glen Canyon Dam and Reservoir is required under the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. The trial court's order and opinion is reported at 455 F.Supp. 641 (D.Utah 1977).
 
 
 2
 The Rainbow Bridge National Monument is a 160-acre tract of land in southern Utah, set aside by executive order for scientific and historical purposes. 36 Stat. 2703 (1910). Within this parcel is Rainbow Bridge, a great sandstone arch 309 feet high with a span of 278 feet. The Monument, which is surrounded by the Navajo reservation, is administered by the National Park Service. Glen Canyon Dam, located on the Colorado River fifty-eight miles below the Monument, is a 710-foot high structure built pursuant to Congressional authorization.[1] See 43 U.S.C. § 620. Glen Canyon Reservoir, known as Lake Powell, formed behind the dam after its completion in 1963. By 1970 the lake had entered the 160-acre tract of the Monument and by 1977 the water had a peak depth of 20.9 feet directly under the Bridge. If the lake fills to its maximum capacity, the water apparently will be 46 feet deep under the Bridge.
 
 
 3
 Glen Canyon Dam and Lake Powell are operated by the Bureau of Reclamation under the direction of the Secretary of the Interior. 43 U.S.C. § 620. The federal lands adjacent to Lake Powell, other than the Monument, comprise the Glen Canyon National Recreation Area, see 16 U.S.C. § 460dd, and are administered by the National Park Service. See id. §§ 1, 460dd-3.
 
 
 4
 Prior to the creation of Lake Powell, Rainbow Bridge National Monument was isolated and was visited by few tourists. The lake now provides convenient access to the Monument. Boats licensed by the Commissioner of the Bureau of Reclamation and the Director of the National Park Service bring tourists to the Monument. Docking facilities have been constructed near the Bridge to serve tour boats and private boats.[2] Visitors to the Monument are subject to the regulation and control of the National Park Service. See 16 U.S.C. § 1 et seq.
 
 
 5
 The individual plaintiffs are Indians residing in the general area of Rainbow Bridge National Monument in southern Utah and are enrolled members of the Navajo Tribe. Three of these plaintiffs are recognized among their people as medicine men, "religious leaders of considerable stature among the Navajo, learned in Navajo history, mythology and culture, and practitioners of traditional rites and ceremonies of ancient origin." 455 F.Supp. at 642. Three plaintiffs are Navajo chapters, which are local organizations of the Navajo Nation, each consisting of the adult members of its respective community.
 
 
 6
 In 1974 plaintiffs commenced this action for declaratory and injunctive relief against the Secretary of the Interior, the Commissioner of the Bureau of Reclamation and the Director of the National Park Service.[3] In their amended complaint plaintiffs asserted two claims for relief relevant to this appeal: First, that defendants' operation of Glen Canyon Dam and Reservoir and management of Rainbow Bridge National Monument violated plaintiffs' rights under the Free Exercise Clause of the First Amendment; second, that defendants are required by 42 U.S.C. § 4332(2)(C) to provide an environmental impact statement concerning the operation of Glen Canyon Dam and Reservoir and that the continuing operation of the Dam and Reservoir without such a statement violates 42 U.S.C. §§ 4331-35. After consideration of the pleadings, affidavits and discovery documents in the record, the trial court granted defendants' motions for summary judgment, from which this appeal was taken.
 
 
 7
 * In essence, plaintiffs' free exercise claim is that government action has infringed the practice of their religion in two respects: (1) by impounding water to form Lake Powell, the government has drowned some of plaintiffs' gods and denied plaintiffs access to a prayer spot sacred to them; and (2) by allowing tourists to visit Rainbow Bridge, the government has permitted desecration of the sacred nature of the site and has denied plaintiffs' right to conduct religious ceremonies at the prayer spot.
 
 
 8
 The trial court gave two reasons for granting summary judgment against plaintiffs. First, the court ruled that plaintiffs do not have a cognizable free exercise claim because they have no property interest in the Monument. 455 F.Supp. at 644-45. In the alternative, it held that the federal government's interests in the Glen Canyon Dam and Reservoir as a major water and power project outweigh plaintiffs' religious interests in the Monument. 455 F.Supp. at 645-47. While we affirm the summary judgment in defendants' favor, our reasoning differs somewhat from that of the trial court.
 
 
 9
 At the outset, we reject the conclusion that plaintiffs' lack of property rights in the Monument is determinative. The government must manage its property in a manner that does not offend the Constitution. See Sequoyah v. TVA, 620 F.2d 1159, 1164 (6th Cir. 1980) (lack of property interest not conclusive, but is a factor in weighing free exercise and competing interests). We must look to the nature of the government action and the quality of plaintiffs' positions to determine whether they have stated a free exercise claim. See Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).
 
 
 10
 Analysis of a free exercise claim involves a two-step process. We first determine whether government action creates a burden on the exercise of plaintiffs' religion. "(I)t is necessary in a free exercise case to show the coercive effect of the enactment as it operates against ... the practice of (their) religion." School Dist. of Abington v. Schempp, 374 U.S. 203, 223, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). The practice allegedly infringed upon must be based on a system of belief that is religious, see, e. g., Wisconsin v. Yoder, 406 U.S. at 215-16, 92 S.Ct. at 1533; Kennedy v. Meacham, 540 F.2d 1057, 1060-61 (10th Cir. 1976), and sincerely held by the person asserting the infringement, see, e. g., United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944). If such a burden is found, the action is violative of the Free Exercise Clause, unless the government establishes an interest of "sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." Wisconsin v. Yoder, 406 U.S. at 214, 92 S.Ct. at 1532. "(O)nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." Id. at 215, 92 S.Ct. at 1533.
 
 
 11
 In reviewing a summary judgment, we view the facts and reasonable inferences drawn therefrom in the light most favorable to plaintiffs. The pertinent facts in this case are as follows. Rainbow Bridge and a nearby spring, prayer spot and cave have held positions of central importance in the religion of some Navajo people living in that area for at least 100 years. These shrines are regarded as the incarnate forms of Navajo gods, which provide protection and rain-giving functions. For generations Navajo singers have performed ceremonies near the Bridge and water from the spring has been used for other ceremonies. Plaintiffs believe that if humans alter the earth in the area of the Bridge, plaintiffs' prayers will not be heard by the gods and their ceremonies will be ineffective to prevent evil and disease. Because of the operation of the Dam and Lake Powell, the springs and prayer spot are under water. Tourists visiting the sacred area have desecrated it by noise, litter and defacement of the Bridge itself. Because of the flooding and the presence of tourists, plaintiffs no longer hold ceremonies in the area of the Bridge.
 
 
 12
 * With respect to the government action of impounding water in Lake Powell the stated infringement is the drowning of the Navajo gods, the increased tourist presence attributable to the level at which the lake is kept, and the denial of access to the prayer spot now under water. We agree with the trial court that the government's interest in maintaining the capacity of Lake Powell at a level that intrudes into the Monument outweighs plaintiffs' religious interest. This Court has previously considered the importance of the Glen Canyon Dam and Reservoir as a crucial part of a multi-state water storage and power generation project. See Friends of the Earth v. Armstrong, 485 F.2d 1 (10th Cir. 1973), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974). In the instant case unrebutted evidence, by affidavit, shows that the storage capacity of the lake would be cut in half if the surface level were dropped to an elevation necessary to alleviate the complained of infringements. The required reduction would significantly reduce the water available to the Upper Basin States of Colorado, New Mexico, Utah and Wyoming from the Colorado River.
 
 
 13
 Such a reduction of use in each of the above Upper Colorado River Basin States would among other things limit and reduce the development of water supplies within these States on either a permanent basis or on a limited long-term basis for irrigation purposes, for development of mineral and other natural resources, and for municipal and industrial water supplies.
 
 
 14
 Aff. of David L. Crandall, Regional Director of the Upper Colorado Region of the Bureau of Reclamation. Moreover, it is reasonable to conclude that no action other than reducing the water level would avoid the alleged infringement of plaintiffs' beliefs and practices. In these circumstances we believe the government has shown an interest of a magnitude sufficient to justify the alleged infringements.[4]
 
 B
 
 15
 The second basis for plaintiffs' free exercise claims concerns management of the Monument by the National Park Service. Specifically, plaintiffs assert that tourists visiting the Monument desecrate the area by noisy conduct, littering and defacement of the Bridge and that the presence of tourists prevents plaintiffs from holding ceremonies near the Bridge.
 
 
 16
 The gravamen of plaintiffs' claim is that by permitting public access and the operation of commercial tour boats the government has burdened the practice of plaintiffs' religion. In their complaint plaintiffs seek an order requiring the government officials "to take appropriate steps to operate Glen Canyon Dam and Reservoir in such a manner that the important religious and cultural interests of Plaintiffs will not be harmed or degraded," and "to issue rules and regulations to take adequate measures preventing further desecration and destruction of the Rainbow Bridge area by tourists, and otherwise to take adequate measures to preclude impairment of the Rainbow Bridge National Monument." (R. 543) In their brief-in-chief, plaintiffs state they "seek only some measured accommodation to their religious interest, not a wholesale bar to use of Rainbow Bridge by all others." (Appellants' Br. 8.) They suggest some specific types of relief, such as prohibiting consumption of beer at the Monument and closing the Monument on reasonable notice when religious ceremonies are to be held there. (Appellants' Br. 25.) In their reply brief, plaintiffs summarize their claim as follows: "The main thrust of appellants' claim seeks to eliminate government actions which encourage destructive visitor use of the Bridge, and to permit, on infrequent occasions, appellants or other Navajos to conduct religious ceremonies there in private." (Appellants' Reply Br. 3.)
 
 
 17
 Free exercise claims generally challenge government dictates which compel citizens to violate tenets of their religion; see Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (Wisconsin's compulsory education law violated Amish free exercise of religion); Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (statute requiring all motor vehicles of New Hampshire to bear the motto "Live Free or Die" violated Jehovah's Witness followers' First Amendment rights), or government action which conditions a benefit or right on renunciation of a religious practice. See McDaniel v. Paty, 435 U.S. 618, 633-34, 98 S.Ct. 1322, 1331, 55 L.Ed.2d 593 (1978) (Tennessee provisions barring ministers from serving as delegates or legislators violated the First Amendment); Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (disqualification of appellant from unemployment compensation because of refusal to work on Saturday contrary to religious beliefs violated Free Exercise Clause).
 
 
 18
 The government here has not prohibited plaintiffs' religious exercises in the area of Rainbow Bridge; plaintiffs may enter the Monument on the same basis as other people. It is the presence of tourists at the Monument and their actions while there that give rise to plaintiffs' complaint of interference with the exercise of their religion. We are mindful of the difficulties facing plaintiffs in performing solemn religious ceremonies in an area frequented by tourists. But what plaintiffs seek in the name of the Free Exercise Clause is affirmative action by the government which implicates the Establishment Clause of the First Amendment. They seek government action to exclude others from the Monument, at least for short periods, and to control tourist behavior.
 
 
 19
 Unquestionably the government has a strong interest in assuring public access to this natural wonder. Congress has charged the Park Service with the duty to provide "for the enjoyment of (parks and monuments) ... by such means as will leave them unimpaired for the enjoyment of future of the generations." 16 U.S.C. § 1. Toward this end, the Secretary of the Interior is empowered to
 
 
 20
 grant privileges, leases, and permits for the use of land for the accommodation of visitors in the various parks, monuments, or other reservations provided for under section 2 of this title, but for periods not exceeding thirty years; and no natural curiosities, wonders, or objects of interest shall be leased, rented, or granted to anyone on such terms as to interfere with free access to them by the public....
 
 
 21
 16 U.S.C. § 3. The Park Service's action of allowing public access to the Monument in accordance with this legislative grant provides the legal basis for plaintiffs' presence as well as the presence of the tourists.
 
 
 22
 Issuance of regulations to exclude tourists completely from the Monument for the avowed purpose of aiding plaintiffs' conduct of religious ceremonies would seem a clear violation of the Establishment Clause.
 
 
 23
 The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion.
 
 
 24
 School Dist. of Abington v. Schempp, 374 U.S. at 222, 83 S.Ct. at 1571. Exercise of First Amendment freedoms may not be asserted to deprive the public of its normal use of an area. Shuttlesworth v. Birmingham, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969); Amalgamated Food Employees Union v. Logan Valley Plaza, Inc., 391 U.S. 308, 320, 88 S.Ct. 1601, 1609, 20 L.Ed.2d 603 (1968); Cox v. Louisiana, 379 U.S. 536, 554-55, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); Niemotko v. Maryland, 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). Government action has frequently been invalidated when it has denied the exercise of First Amendment rights compatible with public use.
 
 
 25
 Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; but it must not, in the guise of regulation, be abridged or denied.
 
 
 26
 Hague v. CIO, 307 U.S. 496, 515-16, 59 S.Ct. 954, 963-64, 83 L.Ed. 1423 (1939). We find no basis in the law for ordering the government to exclude the public from public areas to insure privacy during the exercise of First Amendment rights.
 
 
 27
 We must also deny relief insofar as plaintiffs seek to have the government police the actions of tourists lawfully visiting the Monument. Although Congress has authorized the Park Service to regulate the conduct of tourists in order to promote and preserve the Monument, see 16 U.S.C. §§ 1, 3, we do not believe plaintiffs have a constitutional right to have tourists visiting the Bridge act "in a respectful and appreciative manner." (Appellants' Reply Br. 4.)
 
 
 28
 The First Amendment protects one against action by the government, though even then, not in all circumstances; but it gives no one the right to insist that in the pursuit of their own interests others must conform their conduct to his own religious necessities.... We must accommodate our idiosyncracies, religious as well as secular, to the compromises necessary in communal life.
 
 
 29
 Otten v. Baltimore & O. R. Co., 205 F.2d 58, 61 (2d Cir. 1953) (Learned Hand, J.) (footnote omitted). Were it otherwise, the Monument would become a government-managed religious shrine.
 
 
 30
 The Park Service already has issued regulations applicable to the Monument prohibiting disorderly conduct, 36 C.F.R. § 2.7 (1979), intoxication and possession of alcoholic beverages by minors, id. § 2.16, defacement, id. § 2.20, littering, id. § 2.24, and tampering with personal property, id. § 2.29. These regulations no doubt would be justified as authorized under its charge to conserve and protect the scenery, natural and historic objects for the enjoyment of the public. See 16 U.S.C. § 1. These regulations also provide the relief plaintiffs request as to control of tourist behavior, except perhaps for a total ban on beer drinking.
 
 
 31
 What of the request stated in the appellant's reply brief for access "on infrequent occasions" to conduct religious ceremonies in private? The government asserts that plaintiffs, in common with other members of the public, may apply for a public assembly permit to hold religious ceremonies at the Bridge.[5] No one suggests such a permit could not be used to permit access after normal visiting hours when privacy might be assured. The courts have held permit requirements unconstitutional when they have been used to restrain First Amendment rights without narrow, objective standards. E. g., Shuttlesworth v. Birmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Cf. Chess v. Widmar, 635 F.2d 1310 (8th Cir. No. 80-1048, Aug. 5, 1980) (use of university facilities). Our problem is that there is no allegation that any such permit was requested and denied. The pleadings, affidavits and interrogatories suggest no specific time or schedule for religious ceremonies. Indeed, plaintiffs' answers to interrogatories and the proffered affidavit of their expert Karl Luckert indicate the ceremonies are infrequent and scheduled at the request of individual Navajos when a need seems to exist.
 
 
 32
 Plaintiffs cite the Park Service's proposed guidelines for use of Grand Canyon National Park, which prohibit entry on certain sacred Indian religious sites. They also cite the American Indian Religious Freedom Act, 42 U.S.C. § 1996, which states a public policy to permit Indians access to sacred sites for worship, and perhaps to protect them from intrusion. See H.R.Rep.No.1308, 95th Cong., 2d Sess. (1978), reprinted in (1978) U.S.Code Cong. & Ad.News, pp. 1262, 1264. But we do not have before us the constitutionality of those laws or regulations or of any action taken by defendants in alleged violation of them. The pleadings, even as supplemented by the expanded requests in the brief and supported by the proffered evidence, afford no basis for relief.
 
 II
 
 33
 Plaintiffs also seek an order under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4331 et seq., requiring the Department of Interior to draft an environmental impact statement (EIS) on the continuing operation of the Glen Canyon Dam and Reservoir. Alternatively, plaintiffs seek a remand to the district court for trial on this issue. The district court held that the issue was not ripe for judicial review because the agency had not taken a position of sufficient clarity and finality to allow meaningful judicial review. 455 F.Supp. at 648. It also stated that if the issue were ripe for decision an EIS would not be required because operation of the dam involves merely ministerial rather than major federal actions and because no reasonable alternatives would afford relief to plaintiffs. Id. at 648-49.
 
 
 34
 The government now appears to concede the issue is ripe for judicial review, because the Bureau has decided to draft a comprehensive EIS for the entire Colorado River Basin Project. It has also determined that a site-specific EIS on the Glen Canyon unit is not necessary. (Appellees' Brief 24-26.) Thus, we must determine whether the agency's decision not to draft a site-specific EIS for the dam and reservoir is reasonable.[6] See Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1248-49 (10th Cir. 1973).
 
 
 35
 The Colorado River Storage Project Act of 1956, 43 U.S.C. § 620 et seq., authorized the Glen Canyon Dam and Reservoir along with other storage facilities and power plants. Construction began on October 15, 1956, and was completed on September 13, 1963. Six months later, water was first impounded in the project. In September 1968, Congress instructed the Secretary of Interior to promulgate criteria for the storage and release of the water from the Colorado River Project. 43 U.S.C. § 1552(a). The operational criteria were published on June 10, 1970, shortly after NEPA's effective date of January 1, 1970.
 
 
 36
 NEPA requires that federal agencies include an environmental impact statement "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The Bureau apparently agrees with plaintiffs that the continuing operation of the Colorado River Basin Project is a major federal action since it has decided to draft a comprehensive EIS on the entire project. Disagreement between plaintiffs and the Bureau arises because plaintiffs believe an additional site-specific EIS on the Glen Canyon unit is necessary.
 
 
 37
 The criteria in question apply not only to the Glen Canyon unit, but also to all the storage units of the Colorado River Project constructed and operated under three related acts.[7] The title, "Criteria for Coordinated Long-Range Operation of Colorado River Reservoirs," reflects the comprehensive scope of the criteria set by direction of Congress. See 43 U.S.C. § 1552(a). This Court has recognized the interrelated and comprehensive development of the water resource project. Friends of the Earth v. Armstrong, 485 F.2d 1 (10th Cir. 1973), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974).
 
 
 38
 Lake Powell is an important element or link in the Colorado River water and power development. It cannot be considered alone as all the existing projects in the Upper Basin, and the planned ones, are interrelated and interdependent. The projects have different purposes and functions, but are dependent on Lake Powell to provide basic storage necessary to fulfill the delivery requirements to the downstream states and Mexico, especially in dry years.... This interrelation created by the comprehensive plan for development is rather delicate and can be disturbed if the capacity of by far the largest storage or regulating unit is reduced significantly.
 
 
 39
 Id. at 6. We also note that Congress expressly declared that the purpose of the Act which required criteria was the "further comprehensive development of the water resources of the Colorado River Basin." 43 U.S.C. § 1501(a).
 
 
 40
 Although a comprehensive EIS is frequently undertaken after project or site-specific EIS's have been drafted, need for a comprehensive EIS does not automatically establish need for environmental statements of narrower scope. See Kleppe v. Sierra Club, 427 U.S. 390, 410-12, 96 S.Ct. 2718, 2730-31, 49 L.Ed.2d 576 (1976). We find no proposal for criteria or any other major action under NEPA which involves the Glen Canyon project singly; rather it is for the entire Colorado River Basin Project. We therefore find the agency's decision to draft a comprehensive EIS considering the environmental effects of the entire project and its related decision not to draft a site-specific EIS on the Glen Canyon unit were reasonable. The district court correctly granted judgment against plaintiffs on this issue.
 
 
 41
 AFFIRMED.
 
 
 
 [1]
 For a comprehensive description of the statutory scheme governing Glen Canyon Dam and Reservoir, see Friends of the Earth v. Armstrong, 485 F.2d 1 (10th Cir. 1973), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974)
 
 
 [2]
 The Park Service also permitted operation of a floating marina near the Bridge. The government states, however, that the marina has been moved to a different canyon. Appellee's Br. 20 n.6
 
 
 [3]
 The court also granted motions of the Colorado River Water Conservation District, the Southwestern Water Conservation District, the State of Colorado, the State of Utah, and the Central Utah Water Conservancy District to intervene. The interests of these intervenors concern only the operation of Glen Canyon Dam and Reservoir. In this appeal, their arguments are substantially the same as those presented by the government
 
 
 [4]
 Because we agree with the trial court that the government's interest in maintaining the level of Lake Powell is compelling, we do not reach the question whether the government action involved infringes plaintiffs' free exercise of religion
 
 
 [5]
 36 C.F.R. § 2.21 provides in pertinent part:
 (a) Public meetings, assemblies, gatherings, demonstrations, parades and other public expressions of views are permitted within park areas on lands which are open to the general public provided a permit therefor has been issued by the Superintendent.
 "Park area" is defined in the regulations as "all federally owned or controlled areas administered by the National Park Service." 36 C.F.R. § 1.2(f).
 
 
 [6]
 The choice of standard of review here depends upon how the agency action is characterized. Kleppe v. Sierra Club, 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976), requires a showing the agency acted "arbitrarily" in choosing the site specific approach rather than requiring a region-wide EIS. Arguably, that standard should apply to the instant case, which would make plaintiffs' task more difficult. For purposes of this appeal we give plaintiffs the benefit of the doubt and apply the "reasonableness" standard
 
 
 [7]
 These acts are: the Colorado River Storage Project Act, 43 U.S.C. § 620 et seq.; the Boulder Canyon Project Act, 43 U.S.C. § 617 et seq.; and the Boulder Canyon Project Adjustment Act, 43 U.S.C. § 618 et seq